## JIM RYAN v. THE STATE.

No. 1350. Decided November 15, 1911.

Rehearing denied January 17, 1912.

**1.—Murder—Severance—Affidavit—Practice—Statutes Construed.**

In a motion for severance, an affidavit is only required when one of the defendants desires the evidence of the other and that the latter be tried first; where no affidavit is filed, the court directs which one of the defendants is to be tried first. Article 706, Code Criminal Procedure construed.

**2.—Same—Evidence—Codefendant—Witness—Statutes Construed.**

Upon trial of murder there was no error in permitting a codefendant to remain in the courtroom, as he could not testify for the defendant, and was not offered as a witness for the State; and the court correctly refused to permit him to testify or to permit his evidence at the examining trial to be introduced for defendant. Article 771, Code Criminal Procedure construed.

**3.—Same—Evidence—Codefendant.**

A codefendant can not be witness for a defendant either directly or indirectly, and what he told a third party about the homicide is inadmissible.

**4.—Same—Evidence—Dying Declarations.**

Upon trial of murder, there was no error in admitting in evidence both the written and oral dying declarations of the deceased, proper predicate having been laid.

**5.—Same—Evidence—Wife of Codefendant.**

Where defendant himself objected that the wife of the codefendant be permitted to testify, he could not complain that an attorney who was not employed by him made the same objections; besides, the bill of exceptions as to the admissibility of such testimony is defective and can not be considered on appeal.

**6.—Same—Witnesses Under Rule—Discretion of Court.**

The matter of placing witnesses under the rule and permitting them to converse with or hear testimony of other witnesses is largely in the discretion of the court, and where the bill of exceptions does not show the character of the testimony admitted, the same can not be considered on appeal.

**7.—Same—Evidence—Res Gestae.**

Where the statement of the witness, as to what she said and what the deceased told her as to who did the killing, was in such close proximity of

the scene and time of the homicide that defendant could probably have heard at least some of it, the same was res gestae and admissible in evidence.

### 8.—Same—Evidence—Principals.

Where, upon trial of murder, the defendant had testified that he did not know of any trouble between his codefendant and deceased, and it was shown that the defendant was present at the homicide, there was no error to admit testimony that said codefendant and defendant were together shortly before the homicide and that the latter was aware that the former and deceased were likely to have trouble; both as impeaching and original testimony.

### 9.—Same—Evidence—Fabrication of Testimony.

Upon trial of murder, where the evidence showed that defendant and his codefendant were together at the time the latter shot deceased in his bedroom, and that no knife was seen near him, then there was no error in admitting testimony that the State's witness had loaned a pocketknife, which was afterwards found in the bed of deceased, to said codefendant, and that defendant had been seen in the room of deceased near the cot on which he lay.

### 10.—Same—Accomplice—Principal—Accessory—Charge of Court.

Where, upon trial of murder, the evidence showed that the defendant was present at the time his codefendant shot and killed the deceased; that they had been together the entire afternoon before the killing, that he placed an open pocketknife near the deceased after the shooting, and that he must have known his codefendant's intent to kill deceased, he was neither an accomplice nor an accessory, and the court's failure to charge thereon was not error, as defendant was a principal under the evidence.

### 11.—Same—Charge of Court—Rule Stated.

No error assigned in the motion for new trial will be considered on appeal, unless the motion specifically points out the error, and when complaint is made of failure to give a special charge, the reasons why said charge should have been given must be assigned in the motion for new trial or in a bill of exceptions, otherwise, the same can not be considered.

### 12.—Same—Charge of Court—Practice on Appeal.

Where a paragraph of the court's charge is subject to the criticism contained in the brief, yet in the motion for new trial no complaint is made thereof, the same can not be considered on appeal. Following Joseph v. State, 59 Texas Crim. Rep., 84, and other cases.

### 13.—Same—Charge of Court—Motion for New Trial—Practice on Appeal.

Complaints of the charge of the court or failure to give special charges requested, occurring for the first time in the motion for new trial, are in the nature of bills of exception and must be equally specific.

### 14.—Same—Evidence—Charge of Court.

Upon trial of murder, there was no error in admitting impeaching testimony of defendant's statements as well as that he knew that trouble existed between his codefendant and deceased when they went to the latter's hotel, and that defendant was urging trouble, and there was no error in the court's failure to limit this testimony, or that a knife had been found with the deceased.

### 15.—Same—Argument of Counsel—Bill of Exceptions.

In the absence of a bill of exceptions, an objection to the argument of counsel, can not be considered.

Appeal from the District Court of Matagorda. Tried below before the Hon. Wells Thompson.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Gaines & Corbett* and *E. T. Branch,* for appellant.—On the question that defendant was not a principal: Oates v. State, 51 Texas Crim. Rep., 449; Grant v. State, 60 Texas Crim. Rep., 358, 127 S. W. Rep., 173; Brown v. State, 16 Texas Crim. App., 197; Golden v. State, 18 Texas Crim. App., 637; Sharp v. State, 29 id., 211; Jackson v. State, 20 id., 192; Walker v. State, 29 id., 625; Schribe v. State, 35 S. W. Rep., 375; Johnson v. State, 70 id., 83; Schackey v. State, 41 Texas Crim. Rep., 255.

On question of court's failure to submit defensive theory on question of defendant's presence at homicide, in connection with charge on principals: Johnson v. State, 29 Texas Crim. App., 153; id., 30, id., 421; Bennett v. State, 30 id., 341; Shamburger v. State, 24 id., 433; Moore v. State, 28 id., 377; Crook v. State, 27 id., 198; Moody v. State, 52 Texas Crim. Rep., 232; Henderson v. State, 51 id., 193; Stewart v. State, id., 223; Vann v. State, 45 id., 443; Maloney v. State, 57 id., 435; Rutherford v. State, 48 id., 431; Bird v. State, 49 id., 96.

In a felony case the defendant is entitled to a distinct and affirmative charge on his theory of defense: Condron v. State, 62 Texas Crim. Rep., 485, 138 S. W. Rep., 594; Munroe v. State, 47 Texas Crim. Rep., 59; McMahon v. State, 46 id., 540; Cecil v. State, 44 id., 450; Goodwin v. State, 58 id., 496; Freeman v. State, 52 id., 500; Bollen v. State, 48 id., 70; Patton v. State, 136 S. W. Rep., 459; Wood v. State, 28 Texas App., 14; Jackson v. State, 20 id., 192; White v. State, 18 id., 57; Reynolds v. State, 8 id., 412.

On question of admitting codefendant's wife's testimony: Brock v. State, 44 Texas Crim. Rep., 335; Davis v. State, 45 id., 292; Spivey v. State, id., 496; Moore v. State, id., 234; Spencer v. State, 52 Texas Crim. Rep., 289; Baumer v. State, 55 id., 416; Dungan v. State, 39 id., 115; Dill v. State, 1 Texas Crim. App., 278.

On admissions of declarations of third party as not res gestae: Ex parte Kennedy, 57 S. W. Rep., 648; Felder v. State, 23 Texas Crim. App., 479; McCommic v. State, 52 Texas Crim. Rep., 493; Stevison v. State, 48 id., 601; Sauls v. State, 30 Texas Crim. App., 496.

On question of admitting hearsay evidence: Belderman v. State, 16 Texas, 131; Reeves v. State, 7 Texas Crim. App., 276; Cervantes v. State, 52 Texas Crim. Rep., 82; McAvoy v. State, 39 id., 684.

On court's duty to give special charges when not covered in main charge: Guajargo v. State, 24 Texas Crim. App., 603; Bell v. State, 2 id., 215; Farrar v. State, 29 id., 253; Tyson v. State, 14 id., 388; Jenkins v. State, 34 Texas Crim. Rep., 201; Stanton v. State, 42 id., 269.

It was error to refuse special charges, without regard to any reason for their refusal, for their contents being set out in the motion for new trial was enough to show what the reasons were: Coleman v. State, 54 Texas Crim. Rep., 396; Holt v. State, 57 id., 432; Close

v. State, 55 id., 380; Moss v. State, 59 id., 68; Tankersley v. State, 51 id., 224; Lewis v. State, id., 7, 567; Jackson v. State, 20 Texas Crim. App., 192; King v. State, 61 Texas Crim. Rep., 190, 134 S. W. Rep., 687; Condron v. State, 62 Texas Crim. Rep., 485, 138 id., 594; Stanley v. State, 62 Texas Crim. Rep., 306, 137 id., 703.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—The grand jury of Matagorda County indicted W. W. Lawrence and appellant jointly, charging them with murder. There was a severance and appellant placed on trial first. Appellant, in his first bill of exceptions, complains that the court granted a severance when no affidavit had been filed asking that a severance be granted. Article 706 of the Code of Criminal Procedure, provides: "When two or more defendants are jointly prosecuted they may sever in the trial upon the request of either." The bill of exceptions shows that Lawrence requested a severance, and the court did not err in granting it. An affidavit is only required when one of them desires the evidence of the other, and desires that he be first tried, then an affidavit must be filed stating that such defendant verily believes there is not sufficient evidence against his codefendant to secure his conviction. When jointly indicted and a severance is requested and no affidavit filed, it is a matter within the discretion of the court as to which shall be first tried.

Neither was there error in permitting W. W. Lawrence, codefendant, to remain in the courtroom. He had not been summoned as a witness, and under the law he could not be a witness for the defendant. Had the State sought to use Lawrence as a witness, a different question would be presented, but as the State did not seek to use him as a witness, and the defendant could not, under the law do so, the court did not err in permitting him to remain in the courtroom. The court did not err in refusing to permit Lawrence to testify at the instance of defendant, nor did it err in refusing to permit the evidence of Lawrence taken at the examining trial to be introduced in evidence. Article 771 of the Code of Criminal Procedure provides: "Persons charged as principals, accomplices or accessories, whether in the same indictment or different indictments, can not be introduced as witnesses for one another." Lawrence and appellant were jointly indicted for murder, and neither was a competent witness for the other. Barnes v. State, 28 Texas Crim. App., 29; Carrico v. State, 36 Texas Crim. Rep., 618; Woods v. State, 26 Texas Crim. App., 490.

Neither was there any error in not permitting the sheriff to testify what appellant's codefendant had told him in reference to the way the killing occurred, and statements made in regard to appellant's conduct. A codefendant, neither directly nor indirectly, can be a witness for a defendant.

The State introduced the following statement as the dying declara-

tions of the deceased: "I, R. H. Buchheit, believing that I am going to die make this my dying statement. This evening about 6 o'clock I phoned up to Mr. Will Lawrence that I was going to quit. He said, 'No, you ain't, either,' and we never said no more. About 8 o'clock he rang me up and said, 'You have got to leave the field. Go down and get your check.' I said, 'No, I won't,' and about 8:30 he came here to the door and knocked at the door. I opened the door and he came in and asked me how the well was, and I told him all right, and about that time he began shooting me. He shot once and blood shot my arm, and then shot me in the stomach, and run. I was sitting on the bed and he was standing up when he shot me. (Signed) R. H. Buchheit."

The testimony of the sheriff, who took down the statement, and the attending physicians, show that deceased had been informed he could not live, was conscious of approaching death and the statement was voluntarily made and that he was in possession of all his faculties, although suffering intense pain. The witness was permitted to state over objection of defendant, that subsequent to the time the statement was written and signed, deceased was asked the question, "Was there anyone else in the room besides Lawrence?" to which question he answered that appellant was in the room; and the two physicians were permitted to testify to statements made by deceased to them or in their presence after they had informed him he could not live, which did not conflict with the written statement, but added some additional details. All of this testimony was objected to by appellant, but under the holdings of this court we think the testimony was admissible.

In bill of exceptions No. 4 appellant complains that when the State offered Mrs. Lawrence as a witness that Mr. W. M. Holland objected to her being permitted to testify, as she was the wife of the codefendant, who had not been tried. Appellant's objection is that Mr. Holland was not an attorney representing him and had no right to participate in this trial. Mr. Holland, of course, had no right to volunteer any objections, but his doing so could not have been hurtful to appellant. In bill of exceptions No. 9 appellant himself objected to this witness being permitted to testify, but as in this bill, it is not shown that the witness testified to any fact, the bill is incomplete and can not be considered.

Again, in bill No. 6 the following proceedings are complained of: "The rule having been previously invoked and enforced in the trial of this cause, the defendant asked the witness Mrs. W. W. Lawrence the following questions: Q. Mrs. Lawrence, have you heard any of the testimony given in this case? A. Well, sir, I did one evening. Q. You were in the courtroom? A. Yes, sir, a little while one afternoon. Some of these witnesses I did not know who they were. Q. Did you hear any of the testimony of the defendant last evening? You were standing at the door there in that room and

heard part of the testimony of the defendant, Jim Ryan? A. No, sir; Mrs. Stacey stood there a little while. Q. Did she repeat to you what the testimony was? A. No, sir. Questions by Mr. Styles, district attorney: Did you have reference to this trial of this cause, or some other trial of the testimony you heard? A. I have reference to this trial." The objection urged is that the witnesses had been placed under the rule. This is a matter within the discretion of the trial court, and in the absence of any of the bills relating to her testimony showing that she testified, and what she testified, this court can not say that the court erred in its rulings. Bills of exception to be considered by this court must state the evidence adduced so that this court, without referring to other parts of the record, can know whether or not the testimony was admissible. Green v. State, 43 S. W. Rep., 1003; Howerton v. State, 43 S. W. Rep., 1018; Ross v. State, 45 S. W. Rep., 808.

It appears that Mrs. N. Huddleston testified: "I saw R. H. Buchheit when he ate his supper, but I did not see him any time after that until after the shooting. I heard somebody go into the front room, the one usually occupied by him, R. H. Buchheit, and close the door. This was before I retired that night. After I had gone to bed I heard a buggy come across the bridge and stop at the front gallery and somebody passed my window and went upstairs; then I heard someone come in the hall. There was one or two. There was two or more men. I could tell by their footsteps, and they stopped at the little window. I thought it was some of the boys had come from home, in town and had been out about the derricks, or wells, and come to the house for something. There was more than one footstep that came and stopped at the window. I do not know that there was more than one that passed the window. I just heard one cross the hall, and someone came to Buchheit's door and knocked and called him. I recognized the voice as W. W. Lawrence's. I heard the voice two or three times, and the boy (meaning Buchheit) answered as if he had been asleep, and just woke up. W. W. Lawrence told him that he wanted to talk to him about the well. Buchheit told him all right. I do not know whether or not Buchheit opened the door or W. W. Lawrence opened it, but the door was opened, for I heard it. Some person went in. I heard him say something else to Buchheit concerning the well. I heard the well mentioned. I do not think it was any of my business, but there was something else said to Buchheit when the first shot was fired. I do not know what the last words he said were. I heard no angry words that led me to believe that there was a fuss or anything going to happen. I simply thought they were attending to their own business. I heard one shot fired, then two more, and Buchheit hollered. I recognized his voice. He hollered as if he was hurt. I do not know what was said, I only heard the noise. I heard Buchheit holler like he was in pain. I did not know whether he hollered before or after

the third shot. I was kind of frightened or excited. I did not know just exactly what it meant. I then jumped out of bed, Mr. Huddleston and I, to see what was the matter. Mr. Huddleston went to the door, or started to the door, and I pushed him back and told him not to go outside for someone might shoot him. I opened the door and rushed out. Of course, I did not think anybody would hurt me. Anyway I went out, and there were two men, W. W. Lawrence and another. I saw two men going out of the hall like they were leaving the room. I saw these two men going out of the door between Buchheit's door and the bedroom. I asked them who they were. They made no answer, and as I got to the door they were getting in their buggy off the gallery. . . . When I saw the men getting in the buggy and recognized them as Jim Ryan and W. W. Lawrence, and I said, 'My God! It's Jim Ryan and Bill Lawrence, and they have killed Shorty Buchheit' (meaning R. H. Buchheit).

"I then turned and went into the room. There was no one in the room at the time except the deceased. He was backed up in the corner of the room by the little shelf, in the southeast corner of the room, kind of on his all-fours, like he was crawling out. He was on the side of the room next to the window. I went to him as soon as I saw him. He had on nothing but his undershirt and drawers. When I went to him I asked him, 'Shorty, have they killed you?' He says: 'I believe they have, Mrs. Huddleston.' I says: 'Who was it, do you know?' He says: 'It was Jim Ryan and Bill Lawrence.'" Exceptions were reserved to the exclamation of the witness, "My God! It's Jim Ryan and Bill Lawrence, and they have killed Shorty Buchheit," and to the statement of Buchheit that it was Jim Ryan and Bill Lawrence who had killed him.

While not enough of the testimony is copied in the bills themselves for us to determine whether or not the statements objected to are admissible, what was said and done at this time by the deceased would be admissible as res gestae. See Jeffries v. State, 9 Texas Crim. App., 598, and section 1236 of White's Penal Code, where the authorities will be found collated. Mrs. Huddleston's testimony would show that defendants were getting off the gallery while she was at the door, putting them in close proximity, and he could have and probably did hear it; at least, he testifies in this case and does not testify that he did not hear it.

The State introduced Alvin Lawrence as a witness, and his testimony would tend to show that Lawrence and Ryan were together and that appellant Ryan was aware that Lawrence and Buchheit were likely to have trouble, as he was asked by this witness to go with his brother to the hotel and try to keep him out of trouble. Ryan had testified he did not know of any trouble between Lawrence and deceased. The testimony was admissible, and the court did not err in his charge in not limiting the testimony. It was admissible not only for the purpose of impeaching appellant, but was admissible

also to show that appellant knew of the existence of trouble between Lawrence and Buchheit.

In bill of exceptions No. 11 appellant complains that "the witness E. Fitzgerald was permitted to testify that he loaned W. W. Lawrence a knife prior to the 16th day of September, 1910, as follows: 'The knife I loaned W. W. Lawrence was given to me by my half-brother. He brought it with him from Tennessee. I think I would know the knife if I was to see it. I have never seen any other knife like it since I have been in Markham oil field. (Witness identified knife) and stated: 'I loaned that knife to Mr. Lawrence some time before the killing and he never returned it.'" In this connection we will also consider bill of exceptions No. 12: "The witness Travis H. Hayes was permitted to testify as follows: 'I helped to move the mattress that was placed under Buchheit. We took the mattress off the cot that Buchheit used to sleep on and placed it under him on the cot where he was put after the shooting, to try and make him more comfortable. I do not remember the other parties who were helping at the time. We simply raised Buchheit up and slipped the mattress in under him. Up to that time I had seen no knife. I was still at the hotel when Jim Ryan came back there, and I saw him when he went into the room and went around to the cot where Buchheit was lying and spoke to him a few words. There was nobody else there at that time. After Ryan had left the cot and came away I was back over with Buchheit at his cot. Dave Presley was in the room at the time. After I had come back into the room I noticed a knife under the bed by Buchheit's side, or rather in the bed, about a foot from the center of the bed. The knife was under Buchheit and open. I picked up the knife and placed it on the shelf near the center of the cot. I did not show the knife to Presley, but he could see it.' Here witness identified the knife, being the same knife loaned by Fitzgerald to Lawrence."

Appellant objected to this testimony, but inasmuch as the testimony of the witnesses show that Buchheit was placed on a different cot from the one on which he was shot, and that there was no knife on the cot when he was placed thereon, and it was found on the cot immediately after Ryan had come back and gone to the cot on which deceased was lying, and the knife was identified as a knife last seen in his, codefendant's, possession, it was admissible as a circumstance, with the other facts and circumstances in evidence, to prove that he was acting with Lawrence.

This disposes of all the bills of exception in the record in regard to the testimony. The evidence shows beyond doubt that Lawrence is the man who fired the shots that killed deceased. It also shows that appellant was with Lawrence, virtually the entire afternoon before the killing; that he was informed that there was trouble between deceased and Lawrence, and that before going to the oil field, at the home of the latter, he offered to bet Lawrence $2 that

Buchheit (the deceased) would whip him when he got to the oil field. They went to the oil field, and not finding Buchheit there, Ryan, who was to work that night, got excused, and went with Lawrence to the hotel where Buchheit was sleeping. That they both went in the hotel, and Buchheit says both came into the room. This record gives no excuse or justification for Lawrence killing Buchheit, except that Lawrence was drinking heavily. They left together, and Ryan (appellant) returned to the hotel. A witness says: "Ryan drove up in front of the house. I walked out on the gallery. Ryan drove or came up with some other gentleman. This was about a half or three-quarters of an hour after the shooting. He drove up to the southeast corner of the house near the gallery, got out of the buggy. I walked to the southwest corner of the gallery, and he said: 'How are you?' and I answered: 'Pretty fair.' Then he said: 'What is the matter in here? What is the excitement?' I do not remember the exclamation he used. And I said: 'A man got killed.' About that time Mr. Singleton started around the house, and said, 'He is dead.' Mr. Ryan spoke up and asked, 'Who?' and I said, 'Shorty Buchheit,' and then he asked, 'Who shot him?' and I answered: 'I do not know; they tell me you and Lawrence.' And he said, 'No, I know nothing about it. I have just come from Markham.' I said: 'I do not know—I think that is what they tell me.' Then he asked me if I reckoned if they would care if he should go in and see Buchheit, and then I said: 'No, I suppose not.' Then he said: 'Well, I believe I will go in and talk to him,' which he did. He went around the front of the cot where Buchheit was lying, rather between the cot and the wall. I was standing just outside of the window, right directly from the west side of the building, and Ryan says: 'Hello, Shorty,' and Buchheit spoke up and said: 'Do not talk to me; I do not want you to speak to me,' and he said, 'What is the matter, Shorty?' and Buchheit answered: 'You know what is the matter.' Mrs. Huddleston then went to him and told him to come out of the room, and finally Ryan walked out in the hallway."

As hereinbefore stated, another witness states, immediately after Ryan left an open knife was found on the cot by the deceased, which knife was shown to have been in the possession of Lawrence prior to the homicide. They were arrested that night and Lawrence and Ryan were together when arrested. The court charged on circumstantial evidence and the jury found appellant was a principal, and sentenced him to the penitentiary for ten years.

Appellant asked the court to charge the jury that if they believed the evidence showed appellant to be an accomplice to acquit him, and asked a charge that if the jury believed appellant was an accessory to acquit him. The evidence in the case did not call for such charges. Under the evidence, appellant would be a principal, if guilty of any offense. The placing of the knife in the bed with deceased, if the jury believed appellant did do so, was a circumstance to be taken

with the other evidence adduced in determining whether appellant was acting with Lawrence in the commission of the offense, and in doing this preparing a joint defense, if no one discovered that he had placed it there. Appellant requested some twelve special charges, none of which were given. In his motion for a new trial, appellant complains of the failure of the court to give the special instructions in the following manner: "Because the court erred in refusing to give defendant's special charge No. ———, reading as follows: (here followed the charge of a given number); because the same was not actually and substantially covered by the charge of the court, and should have been given as the defendant Jim Ryan had a right to have this aspect of the case presented." · To others was added, "Because the same was not sufficiently set out in the charge of the court;" while to others no reason was assigned why the court erred in refusing to give the charge. Individually the writer of this opinion would hold, were this an open question, that when a special charge is requested and refused, applicable to and called for by the evidence, and which question is improperly presented in the main charge, even though the motion for a new trial only says that the court erred in failing to give the special charge, setting out the charge requested, this court should review the matter, and if the question is of sufficient importance, reverse the case. The court, in his main charge, erred in that paragraph in which he attempted to affirmatively present the defensive theory of defendant, that is, that even though the defendant was present at the homicide, if in fact he did not know of the unlawful intent of Lawrence, and did not aid and encourage Lawrence by act or word, he would not be a principal. However, there is no complaint in the motion for a new trial of this paragraph of the court's charge, and under all the authorities we can not review that paragraph of the charge of the court ·in that respect, since the amendment of article 723. Appellant's special charges Nos. 3, 4 and 12 presented his theory of the case, and it is the writer's opinion that a charge properly presenting his theory should have been given, and it was error not to do so. But this court has held that no error assigned in the motion for a new trial will be considered on appeal, unless the motion specifically points out the error and that when complaint is made of failure to give a special charge, that the reasons why said charge should have been given must be assigned in the motion for a new trial, or in a bill of exceptions, and in case it is not done such ground will not be considered on appeal, and as the reasons assigned in this charge on account of the failure to give the special charges are general in their nature, and do not attempt to point out specifically wherein the court erred in failing to give such charge or charges, nor point out any error in the charge, this court will not consider the grounds assigned for failure to give the special charges. See Joseph v. State, 59 Texas Crim. Rep., 82;

Kubacak v. State, 59 Texas Crim. Rep., 166; Pollard v. State, 58 Texas Crim. Rep., 299; Duncan v. State, 55 Texas Crim. Rep., 169; Holmes v. State, 55 Texas Crim. Rep., 331; Quintana v. State, 29 Texas Crim. App., 402. It is held by the court that complaints of the charge of the court, or failure to give special charges requested, occurring for the first time in the motion for a new trial, are in the nature of exceptions, and must be as specific as would be required as if a bill of exceptions were reserved.

Appellant in his brief assails the charge of the court, especially that paragraph in which he instructed the jury, "But if you believe from the evidence that Jim Ryan was present with Lawrence at the time when the killing took place, but that he was innocently present, etc., he should be acquitted." While this paragraph of the court's charge is subject to the criticism contained in the brief, yet in the motion for a new trial no complaint is made of this portion of the charge. The Legislature has provided by statute, unless the charge is excepted to at the time or in the motion for a new trial, this court shall not reverse for errors therein. This question has been before this court many times, and since the enactment of this provision of the law in an unbroken line of decisions, this court has held it will not consider errors in the charge assigned for the first time in this court, and not contained in the motion for a new trial. Joseph v. State, 59 Texas Crim. Rep., 82; Flourney v. State, 57 Texas Crim. Rep., 88; Benevides v. State, 57 Texas Crim. Rep., 170; Rowan v. State, 57 Texas Crim. Rep., 625; Reyes v. State, 51 Texas Crim. Rep., 421; Sue v. State, 52 Texas Crim. Rep., 122; Wilson v. State, 52 Texas Crim. Rep., 173; Keye v. State, 53 Texas Crim. Rep., 320; Manning v. State, 46 Texas Crim. Rep., 332; Barnett v. State, 42 Texas Crim. Rep., 302; Pena v. State, 38 Texas Crim. Rep., 333; McGee v. State, 43 S. W. Rep., 512; Abbott v. State, 42 Texas Crim. Rep., 8, 57 S. W. Rep., 97; Spears v. State, 41 Texas Crim. Rep., 527, 56 S. W. Rep., 347; Glasgow v. State, 50 Texas Crim. Rep., 642.

There was no error in the court not restricting the testimony of Alvin Lawrence and Mrs. Lawrence. The testimony not only tended to impeach appellant, but also was admissible as showing that appellant knew before he went to the hotel that trouble existed between W. W. Lawrence and deceased, and the testimony of Mrs. Lawrence would indicate that appellant was urging trouble by offering to bet Lawrence that deceased whipped him that night. Neither should the court have restricted the testimony as to the knife being found on the bed just after appellant had gone to the bed, and that the knife was one Lawrence had in his possession before the homicide.

We can not consider that paragraph of the motion which relates to the argument of counsel. There is no bill of exceptions in the record, the motion does not state the language used, and no special charge was requested in regard thereto.

There being no error complained of in the motion for a new trial presenting any reversible error, the judgment is affirmed.

*Affirmed.*

[Rehearing denied January 17, 1912.—Reporter.]